**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Nina Y. Wang**

Civil Action No. 22-cv-00368-NYW

ALEXANDER POGOSYAN,

      Petitioner,

v.

TERRY JAQUES, and
PHILIP WEISER,[1]

      Respondents.

---

**ORDER ON APPLICATION FOR WRIT OF HABEAS CORPUS**

---

      Petitioner Alexander Pogosyan ("Petitioner") is an inmate in the custody of the Colorado Department of Corrections.   Through counsel, Petitioner has filed an Application for Writ of Habeas Corpus Pursuant to 28 U.S.C. § 2254 ("Application"), [Doc. 1, filed February 10, 2022], challenging the validity of his convictions and sentences in Arapahoe County District Court.[2]   On May 17, 2022, Respondents Terry Jaques and Philip Weiser ("Respondents") filed an Answer. [Doc. 24].   On July 21, 2022, Petitioner filed his Reply to the Answer.   [Doc 30].

      After reviewing the record, including the Application, the Answer, the Reply, and the state

---

[1] The Court notes that Respondent Philip Weiser's first name is spelled "Phillip" in the docket caption, but is consistently spelled as "Philip" by the parties.   *See, e.g.*, [Doc. 1 at 1; Doc. 24 at 1].   The Court assumes that the spelling in the caption is the result of a typographical error and adopts the "Philip" spelling.   The Clerk of Court is **DIRECTED** to update the case caption to reflect the correct spelling of Respondent Weiser's first name.

[2] The case in Arapahoe County District Count is numbered 98CR2367.   Judgment was entered on September 27, 1999.   [Doc. 1 at 7].

court record, the Court concludes that Petitioner is not entitled to relief and respectfully **DISMISSES** the Application.

## BACKGROUND

The Court begins with a review of the factual background surrounding this case, followed by a discussion of the state court decisions at issue.[3]

### I.   Factual Background

On September 7, 1998, Zach Obert and Ed Morales were shot and killed in a home on South Paris Way in Aurora, Colorado.  [Doc. 1 at 12].[4]  Later the same day, Marissa Avalos, Greg Medla, and Penny Bowman-Medla were shot and killed in a home on East Harvard Avenue, also in Aurora.  [*Id.*].  Eyewitnesses saw two armed individuals at both shootings, with two other individuals accompanying them in a car at the site of the first shooting.  [*Id.*; Doc. 24 at 12]. Analysis of shotgun shells recovered at the crime scenes established that two different shotguns were fired at each residence.  [Doc. 24 at 6 n.3].  The four individuals in the car at the South Paris Way location were Michael Martinez, Artur Martirosyan, Roman Pogosyan, and Petitioner. [Doc. 1 at 12].  Petitioner and Roman Pogosyan are brothers.  [*Id.* at 14].

It was undisputed at Petitioner's trial that Mr. Martinez was one of the shooters at both locations.  [*Id.* at 12].  The central issue was the identity of the second shooter.  [*Id.*]. According to the prosecution, Petitioner was the second shooter, and he was charged with five counts of first-degree murder after deliberation, five counts of first-degree felony murder, two counts of conspiracy, two counts of first-degree burglary, and one count of being an accessory.

---

[3] The Court draws these facts from the Application and related papers, as well as their attachments. *See generally* [Doc. 1; Doc. 24; Doc. 30].

[4] The Court cites to the docket number and the page numbers assigned by the District of Colorado's Electronic Case Filing ("ECF") system for all documents.

[*Id.* at 7–8, 12].    The defense claimed that Roman Pogosyan was the second shooter and Petitioner was merely present.   [*Id.* at 12].   Following a lengthy trial that spanned three weeks of testimony and five days of jury deliberation, Petitioner was convicted on all but the conspiracy counts.   [Doc. 1 at 27–28; Doc. 24 at 3].   Petitioner is serving five consecutive life sentences with the possibility of parole.   [Doc. 1 at 11].

None of the individuals in the car at the South Paris Way location testified at Petitioner's trial.   [*Id.* at 12].   Petitioner exercised his constitutional right not to testify.   [*Id.*].   Mr. Martinez was shot and killed, also on September 7, 1998, by an unknown individual.   [*Id.*].   Roman Pogosyan was not called as a witness and was never charged with any crime.   [*Id.*].   Mr. Martirosyan, the driver of the car, was charged with murder in connection with the shootings but was not available to testify because he left the state.   [*Id.* at 12].   However, a videotaped portion of one of Mr. Martirosyan's police interviews was played for the jury at Petitioner's trial.   [*Id.* at 13].   During the interview, Mr. Martirosyan admitted he was the driver of the car to and from the South Paris Way shooting, identified the other occupants of the car, and identified Petitioner as the second shooter.   [*Id.* at 14–17].   Mr. Martirosyan also provided details that the prosecution argued were relevant to the second shooting at the East Harvard Avenue location.   *See* [*id.* at 26–27].   In the Application, Petitioner claims that his Sixth Amendment rights under the Confrontation Clause were violated by admission of Mr. Martirosyan's videotaped statement implicating him in the shootings.   [*Id.* at 11].

## II.    The Martirosyan Statement

Mr. Martirosyan was interviewed by police three times before absconding.   The first interview was on September 11, 1998, at his high school.   [*Id.* at 13].   The interview at the school was not recorded and Mr. Martirosyan initially denied knowing anything about the shootings.   [*Id.*

at 13–14].   He was interviewed a second time later the same day at the police station.   [*Id.* at 13].

He was interviewed a third time the next day, also at the police station.   [*Id.*].   The interviews at

the police station were videotaped.   [*Id.*].

The videotaped statement that was played for the jury is an edited portion, approximately

ninety minutes long, of Mr. Martirosyan's first interview at the police station on September 11.

[*Id.* at 21, 25].   The video was admitted pursuant to Rule 804(b)(3) of the Colorado Rules of

Evidence as a statement against Mr. Martirosyan's penal interest.   [*Id.* at 31].   The video was

played during the testimony of one of the detectives who conducted the interview.   [*Id.* at 25].

Because pieces of the video were "inadvertently chopped off," the detective read from the

transcript of the interview to fill in those blanks.   [*Id.*].

At the beginning of the interview, Mr. Martirosyan was advised of his rights, and he agreed

to waive his rights and to have the interview recorded.   [Doc. 1-10 at 2–4].   The interview

consists mainly of Mr. Martirosyan responding to questions, often leading, posed by two

detectives.   [Doc. 1 at 18].   The jury was allowed to see the video one time, and it was not

transcribed into the record.   [*Id.* at 25].   In the interview, Mr. Martirosyan described the events

of September 7, 1998, as follows:

- Mr. Martirosyan picked Petitioner up at the Pogosyan home and drove to a hospital to pick up Mr. Martinez, [Doc. 1-10 at 5–6];

- Mr. Martinez was laughing and making threatening statements including "they snitched on me," "everybody's going down," and "goin[g] to go stab [them]," [*id.* at 8–9];

- Mr. Martinez directed Mr. Martirosyan to drive to Mr. Martinez's apartment and Mr. Martinez went inside to get some kitchen knives, [*id.* at 9–10];

- Mr. Martinez's father was home and did not allow Mr. Martinez to take the knives, [*id* at 5, 10];

- Mr. Martinez went into his apartment a second time and returned with a

4

sport bag, [*id.* at 10–11];

- Mr. Martinez directed Mr. Martirosyan to put the bag in the trunk of the car, [*id.* at 11–12];

- Mr. Martinez directed Mr. Martirosyan to pick up Roman Pogosyan after leaving the Martinez apartment, [*id.* at 16–17];

- After picking up Roman Pogosyan, Mr. Martinez directed Mr. Martirosyan to drive to the South Paris Way location and, during the drive, Mr. Martinez said the sport bag contained shotguns that needed to be hidden, [*id.* at 12–13];

- All four individuals (that is, Mr. Martinez, Mr. Martirosyan, Roman Pogosyan, and Petitioner) were standing in the parking lot at the South Paris Way location when Mr. Martirosyan opened the trunk to get the bag out, [*id.* at 15–16, 18–19];

- Mr. Martinez removed two black, pistol-grip, 12-gauge pump shotguns from the bag and gave one to Petitioner, [*id.* at 20–21];

- Mr. Martinez directed Mr. Martirosyan to turn the car around in the parking lot and keep it running, [*id.* at 21];

- Mr. Martinez and Petitioner walked away from the car, each with a shotgun, and Mr. Martirosyan heard four or five shots approximately ten seconds after Mr. Martinez and Petitioner walked away from the car, [*id.* at 22–24];

- After leaving the South Paris Way location Petitioner was quiet and looked normal, but Mr. Martinez was excited and said "I blew his brains out," [*id.* at 30–31, 41];

- Mr. Martinez told Mr. Martirosyan to drive to Englewood so he could kill his girlfriend, [*id.* at 33];

- Mr. Martirosyan dropped Mr. Martinez and Petitioner off at Mr. Martinez's apartment because Mr. Martirosyan did not want to take them to Englewood, [*id.* at 34–35];

- Mr. Martirosyan and Roman Pogosyan went back to the Pogosyan home, [*id.* at 42];

- Mr. Martirosyan and Roman Pogosyan later picked Mr. Martinez and Petitioner up at a Home Depot, at which time Mr. Martinez was happy and said "I blew her brains out," [*id.* at 48–50];

- Mr. Martinez and Petitioner were dressed differently at the Home Depot and Petitioner was wearing the shirt Mr. Martinez had on earlier, [*id.* at 56];

- Mr. Martinez told Mr. Martirosyan to drive to where the shotguns were hidden but Mr. Martirosyan did not want to and, instead, he drove back to the Pogosyan home where Mr. Martinez, Petitioner, and Roman Pogosyan left the vehicle, [*id.* at 51–52, 58–59];

- Mr. Martirosyan drove home at approximately 4:30 p.m. and had no further contact with Petitioner until Petitioner called around 9:30 p.m., sounding sad, and said "they got [Mr. Martinez] and I'm waiting for my turn," [*id.* at 59–61].

## III.    State Court Ruling

The Confrontation Clause issue was raised at trial, and raised again on Petitioner's direct appeal. *See generally* [Doc. 1-2].   In relevant part, the Colorado Court of Appeals rejected the claim and explained its reasoning as follows:

We also reject defendant's contention that the admission of the driver's videotaped statement denied him his right of confrontation and was prejudicial error.

We review de novo a possible Confrontation Clause violation.   A violation of the Confrontation Clause is subject to a constitutional harmless error analysis.   The reviewing court must be confident beyond a reasonable doubt that the error did not contribute to the guilty verdict.   Bernal v. People, 44 P.3d 184 (Colo. 2002).

Hearsay statements are generally inadmissible.   See People v. Newton, 966 P.2d 563 (Colo. 1998).   Colorado law, however, provides that certain hearsay statements may be admitted.   See Bernal v. People, supra.

To be admissible, a proffered hearsay statement must comply with the specific exception to the hearsay rule under which the statement is offered and must not offend the right to confrontation.   People v. Newton, supra.

CRE 804(b)(3) provides for admission of certain statements against interest, including:

A statement which . . . at the time of its making . . . so far tended to subject [the declarant] to . . . criminal liability . . . that a reasonable man in his position would not have made the statement unless he believed it to be true.   A statement tending to expose the declarant to criminal liability and offered to exculpate the accused is not admissible unless corroborating circumstances clearly indicate the

6

trustworthiness of the statement.

To admit a third-party statement inculpating a defendant, the following three requirements of CRE 804(b)(3) must be satisfied.  First, the witness must be unavailable.  Second, the statement must tend to subject the declarant to criminal liability, and the trial court must determine that a reasonable person in the declarant's position would not have made the statement unless the person believed it to be true.  Third, the People must show by a preponderance of the evidence that corroborating circumstances demonstrate the trustworthiness of the statement.  In analyzing corroborating circumstances, a trial court is limited to circumstances surrounding the making of the statement and should not rely on independent evidence that also implicates the defendant.  The circumstances surrounding the making of the statement include when and where it was made, to whom it was made, what prompted it, how it was made, and what it contained.  See Bernal v. People, supra; People v. Newton, supra.

However, even if a hearsay statement is otherwise admissible under the exception provided in CRE 804(b)(3), the court must deem it inadmissible if it would violate a defendant's constitutional right to confrontation.  People v. Farrell, 34 P.3d 401 (Colo. 2001); Stevens v. People, 29 P.3d 305 (Colo. 2001).  Admission of a statement may violate the constitution unless the statement possesses indicia of reliability by virtue of its inherent trustworthiness, not by reference to other evidence at trial.  See Stevens v. People, supra; People v. Newton, supra.

The Confrontation Clause analysis is incorporated into the third CRE 804(b)(3) requirement when the statement inculpates a defendant.  Bernal v. People, supra.

The court should also consider the nature and character of the statement, the relationship between the parties to the statement, the declarant's probable motivations for making the statement, and the circumstances under which the statement was made.  Stevens v. People, supra.

Statements by a codefendant are inherently and presumptively unreliable.  People v. Bernal, supra.

Here, the parties agreed that the driver was unavailable.  Further, his statement tended to subject him to criminal liability.  After waiving his rights under Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), and agreeing to talk voluntarily, the driver was questioned by police officers in the police interview room.  The driver admitted he drove the car carrying the two shooters to the first crime scene, saw the shotguns, and heard four or five shots.  He then admitted driving the shooters from the crime scene and picking them up again later.  Because the driver could be found to be a complicitor in defendant's actions, these statements were against his penal interest, see § 18-1-603, C.R.S. 2002, and would not have been made by a reasonable person unless he believed them to be true.

However, defendant contends the totality of the circumstances did not rebut the presumptive unreliability of the accomplice hearsay statements, which shifted blame to defendant and minimized participation of the driver.   We disagree.

If the trial court determines that the statement contains a fact against the declarant's penal interest, then it should admit all statements related to the precise statement. However, statements that are so self-serving as to be unreliable should be excluded, and if the declarant had a significant motivation to curry favorable treatment, the entire narrative should be excluded.   See Bernal v. People, supra; People v. Newton, supra.

Here, the trial court found nothing in the record to support a finding the driver "was currying favors."   The court considered that the statements were made at the driver's high school and at the police department and concluded the People established reliability by a preponderance of the evidence, "including where and when the statements were made; what prompted the statement; how the statement was made, including being subject to interrogation and the contents of the statements" [sic].

The driver's statements detail the events of the day, were made shortly after the shootings occurred, and were not in response to promises, suggestions of favorable treatment, or threats by police.   Further, nothing in the videotape indicates that the driver was unstable during the interview.

Defendant cites Lilly v. Virginia, 527 U.S. 116, 119 S.Ct. 1887, 144 L.Ed.2d 117 (1999), for its holding that accomplice statements made to law enforcement during custodial interrogation which incriminate an accused are "presumptively unreliable," viewed with "special suspicion," "inevitably suspect," and a "unique threat" to the truth-finding function of a trial because of an accomplice's strong interest in exculpating himself or herself while inculpating the defendant.

Here, however, the statements clearly expose the driver to significant criminal liability and do not exculpate him while inculpating defendant.   Further, his detailed statements do not shift or spread blame.   See Stevens v. People, supra.

Accordingly, we conclude the driver's videotaped statement was properly admitted into evidence.

[*Id.* at 11–16 (alterations in original)].

The Colorado Court of Appeals affirmed Petitioner's conviction. *See* [*id.* at 23].   On

October 27, 2003, the Colorado Supreme Court denied Petitioner's petition for writ of certiorari

on direct appeal.   *See* [Doc. 1-3 at 2].   State court postconviction proceedings lasted from 2003

until 2021.  [Doc. 1 at 83].  Respondents do not argue that the Confrontation Clause claim is either untimely or unexhausted.  *See* [Doc. 11 at 1].

## LEGAL STANDARD

Pursuant to 28 U.S.C. § 2254(d), a writ of habeas corpus may not be issued with respect to any claim that was adjudicated on the merits in state court unless the state court adjudication:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).  Petitioner bears the burden of proof under § 2254(d).  *See Cullen v. Pinholster*, 563 U.S. 170, 181 (2011).

The Court's inquiry is "straightforward . . . when the last state court to decide a prisoner's federal claim explains its decision on the merits in a reasoned opinion."  *Wilson v. Sellers*, 138 S. Ct. 1188, 1192 (2018).  "In that case, a federal habeas court simply reviews the specific reasons given by the state court *and defers to those reasons if they are reasonable*."  *Id.* (emphasis added).

The threshold question the Court must answer under § 2254(d)(1) is whether Petitioner seeks to apply a rule of law that was clearly established by the Supreme Court at the time the state court adjudicated the claim on its merits.  *Greene v. Fisher*, 565 U.S. 34, 38 (2011).  Clearly established federal law "refers to the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision."  *Williams v. Taylor*, 529 U.S. 362, 412 (2000).  If there is no clearly established federal law, that is the end of the Court's inquiry pursuant to § 2254(d)(1).  *See House v. Hatch*, 527 F.3d 1010, 1018 (10th Cir. 2008).

"[R]eview under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits."  *Cullen*, 563 U.S. at 181.  A state court decision is contrary

to clearly established federal law if the state court either applies a rule that contradicts governing Supreme Court law or decides a case differently than the Supreme Court on materially indistinguishable facts. *See House*, 527 F.3d at 1018. "A state court decision involves an unreasonable application of clearly established federal law when it identifies the correct governing legal rule from Supreme Court cases, but unreasonably applies it to the facts." *Id.* A decision is objectively unreasonable "only if all fair[-]minded jurists would agree that the state court got it wrong." *Stouffer v. Trammell*, 738 F.3d 1205, 1221 (10th Cir. 2013) (quotation omitted).

Section 2254(d)(2) allows the Court to grant a writ of habeas corpus only if the relevant state court decision was based on an unreasonable determination of the facts in light of the evidence presented to the state court. The Court must presume the state court's factual determinations are correct and Petitioner bears the burden of rebutting the presumption by clear and convincing evidence. *See* 28 U.S.C. § 2254(e)(1). The presumption of correctness applies to factual findings of the trial court as well as state appellate courts. *See Al-Yousif v. Trani*, 779 F.3d 1173, 1181 (10th Cir. 2015). The presumption of correctness also applies to implicit factual findings. *See Ellis v. Raemisch*, 872 F.3d 1064, 1072 n.2 (10th Cir. 2017). "But if the petitioner can show that 'the state courts plainly misapprehend[ed] or misstate[d] the record in making their findings, and the misapprehension goes to a material factual issue that is central to petitioner's claim, that misapprehension can fatally undermine the fact-finding process, rendering the resulting factual finding unreasonable.'" *Smith v. Duckworth*, 824 F.3d 1233, 1241 (10th Cir. 2016) (citation omitted).

Finally, the Court's analysis is not complete even if Petitioner demonstrates the state court decision was contrary to or an unreasonable application of clearly established federal law, or was based on an unreasonable determination of the facts in light of the evidence presented. *See*

*Harmon v. Sharp*, 936 F.3d 1044, 1056 (10th Cir. 2019).   If the requisite showing under § 2254(d) is made, the Court must consider the merits of the constitutional claim de novo, *see id.* at 1056–57, and engage in harmless error review.

## ANALYSIS

### I.     Clearly Established Federal Law

The right of an accused to confront the witnesses against him is guaranteed by the Sixth Amendment to the United States Constitution and applies in both federal and state prosecutions. *See Stevens v. Ortiz*, 465 F.3d 1229, 1235 (10th Cir. 2006); *see also* U.S. Const. amend. VI ("In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him.").   "The central concern of the Confrontation Clause is to ensure the reliability of the evidence against a criminal defendant by subjecting it to rigorous testing in the context of an adversary proceeding before the trier of fact."   *Maryland v. Craig*, 497 U.S. 836, 845 (1990).

The parties agree that the relevant Supreme Court law at the time of Petitioner's 1999 trial is found in *Ohio v. Roberts*, 448 U.S. 56 (1980).[5]   In *Roberts*, the Supreme Court held that an exception to the Confrontation Clause permits admission of testimonial hearsay in a criminal trial if two conditions are met: (1) the witness is shown to be unavailable, and (2) the witness's statement bears sufficient indicia of reliability.   *Id.* at 66; *see also Cook v. McKune*, 323 F.3d 825, 830 (10th Cir. 2003).   It is undisputed that Mr. Martirosyan was not available at Petitioner's trial. Therefore, the Court's analysis is limited to the reliability prong of the *Roberts* test.

---

[5] In *Crawford v. Washington*, 541 U.S. 36, 68 (2004), the Supreme Court overruled *Roberts* and held that the Confrontation Clause bars the introduction into evidence of out-of-court statements that are testimonial in nature unless the witness is unavailable and the defendant had a prior opportunity to cross-examine the witness.   However, *Crawford* was decided after Petitioner's conviction was final, and the Supreme Court has held that it does not apply retroactively.   *See Whorton v. Bockting*, 549 U.S. 406, 421 (2007).   The Court thus agrees with the parties that *Roberts* provides the relevant clearly established federal law.

II.    **Sufficient Indicia of Reliability**

Under *Roberts*, the reliability of the testimony at issue can be inferred from the fact that the statement falls "within a firmly rooted hearsay exception" or there is "a showing of particularized guarantees of trustworthiness." *Roberts*, 448 U.S. at 66.

A.    **Firmly Rooted Hearsay Exception**

"Admission under a firmly rooted hearsay exception satisfies the constitutional requirement of reliability because of the weight accorded longstanding judicial and legislative experience in assessing the trustworthiness of certain types of out-of-court statements." *Idaho v. Wright*, 497 U.S. 805, 817 (1990). As noted above, the videotape of Mr. Martirosyan's statement was admitted pursuant to CRE 804(b)(3), the hearsay exception for statements against penal interest.

In a plurality opinion authored by Justice Stevens, the Supreme Court in *Lilly v. Virginia*, 527 U.S. 116 (1999), identified three categories of statements against penal interest. The first category includes "voluntary admissions of the declarant" offered against the declarant. *Id.* at 127. The second category "encompasses [statements] offered as exculpatory evidence by a defendant who claims that it was the maker of the statement, rather than he, who committed (or was involved in) the crime in question." *Id.* at 129. "The third category includes cases . . . in which the government seeks to introduce a confession by an accomplice which incriminates a criminal defendant." *Id.* at 130 (quotation omitted). The Martirosyan statement falls within the third category.

The *Lilly* plurality stated that the practice of admitting statements in the third category is "of quite recent vintage" and "encompasses statements that are inherently unreliable" because an accomplice "often has a considerable interest in confessing and betraying his cocriminals." *Id.* at

130–31 (quotation omitted).   The *Lilly* plurality concluded "[t]he decisive fact, which we make explicit today, is that accomplices' confessions that inculpate a criminal defendant are not within a firmly rooted exception to the hearsay rule as that concept has been defined in our Confrontation Clause jurisprudence."   *Id.* at 134.

Although a plurality decision, the United States Court of Appeals for the Tenth Circuit ("Tenth Circuit") has rejected an argument "that the holdings of the four-Justice *Lilly* plurality are not clearly established federal law."   *Stevens*, 465 F.3d at 1237.   The Tenth Circuit explained that, in *Lilly*, "the concurring opinions of Justices Scalia and Thomas also concluded that the admission of the accomplice's statement violated the Confrontation Clause" and, because "the categorical rule outlined by Justices Scalia and Thomas reads the requirements of the Confrontation Clause more broadly than the plurality[,] [w]e take into account these concurrences and characterize the narrower standards set forth in Justice Stevens's plurality opinion as the 'holding'—and therefore clearly established federal law."   *Id.*; *see also Marks v. United States*, 430 U.S. 188, 193 (1977).

Pursuant to *Lilly* and the cases cited therein, Petitioner argues CRE 804(b)(3) is not a firmly rooted hearsay exception.   [Doc. 1 at 69].   The Court respectfully agrees.   However, it does not appear that the decision of the Colorado Court of Appeals relied on the firmly rooted hearsay exception rationale in rejecting Petitioner's Confrontation Clause claim.   Instead, the state court reasoned that admission of Mr. Martirosyan's statement "may violate the constitution unless the statement possesses indicia of reliability by virtue of its inherent trustworthiness."   [Doc. 1-2 at 13].   Therefore, the fact that admission of Mr. Martirosyan's statement cannot be justified by a firmly rooted hearsay exception does not itself demonstrate that the state court decision is contrary to or an unreasonable application of clearly established federal law under *Roberts*.

### B.    Particularized Guarantees of Trustworthiness

A showing of particularized guarantees of trustworthiness "must . . . be drawn from the totality of circumstances that surround the making of the statement and that render the declarant particularly worthy of belief." *Wright*, 497 U.S. at 820.   The confession of an accomplice is "presumptively unreliable" and "less credible than ordinary hearsay evidence." *Lee v. Illinois*, 476 U.S. 530, 541 (1986).   "Thus, admission of an accomplice's confession violates a defendant's Sixth Amendment rights unless the truthfulness of the statement 'is so clear from the surrounding circumstances that the test for cross-examination would be of marginal utility.'" *Stevens*, 465 F.3d at 1236 (quoting *Lilly*, 527 U.S. at 136).   Under *Lilly*, factors the Court should *not* consider as favorable in assessing the reliability of an accomplice's hearsay statement include: "(1) the voluntariness of an accomplice's confession; (2) the presence of corroborating evidence; (3) the absence of an offer of leniency; and (4) the presence of statements strongly against penal interest." *Farrell v. Soares*, 211 F. App'x 766, 773 (10th Cir. 2007) (citations omitted); *see also Lilly*, 527 U.S. at 137–39.

In *Stevens*, the Tenth Circuit considered whether a defendant's Sixth Amendment right to confrontation was violated when the trial court admitted a non-testifying accomplice's custodial confession that implicated the defendant in a murder-for-hire. *See Stevens*, 465 F.3d at 1231. The confession was admitted pursuant to CRE 804(b)(3). *See id.* at 1233.   The Colorado Supreme Court concluded on direct appeal that the defendant's rights under the Confrontation Clause were not violated, and the federal district court denied habeas corpus relief. *See id.* at 1234.   The Tenth Circuit reversed, reasoning that the state court's decision was contrary to clearly established Supreme Court law because the state court decision "considered the 'genuinely self-inculpatory' nature of [the] statement as the most important factor in the reliability assessment,

and because it also considered other trial evidence, the voluntary nature of the statement, and the absence of a promise of leniency." *Id.* at 1240 (citation omitted).   In *Farrell*, a Confrontation Clause case involving admission under CRE 804(b)(3) of a non-testifying co-defendant's videotaped statement, the Tenth Circuit held that, because the state court relied on three impermissible factors—"the genuinely self-inculpatory nature of the statement," the voluntariness of the statement, and "the absence of a promise of leniency"—the state court's reasoning was contrary to Supreme Court precedent.   *Farrell*, 211 F. App'x at 775.

On Petitioner's direct appeal, the state court correctly observed that "[s]tatements by a codefendant are inherently and presumptively unreliable."   [Doc. 1-2 at 14].   The court then noted that Mr. Martirosyan's statement was voluntary and self-inculpatory.   *See* [*id.*].   Finally, the state court explained its reasoning for concluding the totality of the circumstances rebutted the presumptive unreliability of Mr. Martirosyan's statement:

> Here, the trial court found nothing in the record to support a finding the driver "was currying favors."   The court considered that the statements were made at the driver's high school and at the police department and concluded that the People established reliability by a preponderance of the evidence, "including where and when the statements were made; what prompted the statement; how the statement was made, including being subject to interrogation and the contents of the statements" [sic].

> The driver's statements detail the events of the day, were made shortly after the shootings occurred, and were not in response to promises, suggestions of favorable treatment, or threats by police.   Further, nothing in the videotape indicates that the driver was unstable during the interview.

> Defendant cites Lilly v. Virginia, 527 U.S. 116, 119 S.Ct. 1887, 144 L.Ed.2d 117 (1999), for its holding that accomplice statements made to law enforcement during custodial interrogation which incriminate an accused are "presumptively unreliable," viewed with "special suspicion," "inevitably suspect," and a "unique threat" to the truth-finding function of a trial because of an accomplice's strong interest in exculpating himself or herself while inculpating the defendant.

> Here, however, the statements clearly expose the driver to significant criminal liability and do not exculpate him while inculpating defendant.   Further, his

detailed statements do not shift or spread blame.   See Stevens v. People, supra.
[*Id.* at 15–16 ("[sic]" in original)].

This Court finds that the Colorado Court of Appeals relied on several prohibited factors, including the voluntariness and self-inculpatory nature of the statement and the absence of a promise of leniency.   Although not entirely clear, the state court apparently also considered the fact that the statement was made while in police custody and subject to interrogation as a factor that demonstrated reliability.   However, as recognized by the state court, an accomplice's confession in police custody is presumptively unreliable.   *See Lilly*, 527 U.S. at 138; *Stevens*, 465 F.3d at 1241.   Notably, Respondents concede that some of the facts on which the state court relied "could be used to apply some of the forbidden factors discussed by the Tenth Circuit in *Stevens*." [Doc. 24 at 32].

The Court finds that, because "the Colorado court's calculus improperly relied on factors condemned by Supreme Court precedent," *Stevens*, 465 F.3d at 1240, the state court decision runs afoul of § 2254(d)(1) and the Court must review admission of Mr. Martirosyan's statement de novo.   *See id.*; *see also Farrell*, 211 F. App'x at 775 (reviewing state court decision de novo after finding the state court's consideration of three impermissible factors was contrary to Supreme Court precedent).

## C.      De Novo Review

The Court's independent inquiry into trustworthiness requires examination of Mr. Martirosyan's statement and the setting in which the statement was made.   *See Farrell*, 211 F. App'x at 775 (citing *Lilly*, 527 U.S. at 139).   The Court does not begin the inquiry with a clean slate, however, because Mr. Martirosyan's statement is presumptively unreliable.   "Courts have long recognized that an accomplice's confession in police custody 'is presumptively unreliable as

to the passages detailing the defendant's conduct or culpability.'"  *Stevens*, 465 F.3d at 1241 (quoting *Lee*, 476 U.S. at 545); *see also Farrell*, 211 F. App'x at 775 ("Here, Mr. Blankenship was an accomplice who was interrogated in police custody.   As a result, his statement, like the one at issue in *Stevens*, must be presumed unreliable.").   The question then becomes whether there are sufficient guarantees of trustworthiness to overcome the presumption of unreliability.

The Court already has listed several factors that do not demonstrate trustworthiness, including "(1) the voluntariness of an accomplice's confession; (2) the presence of corroborating evidence; (3) the absence of an offer of leniency; and (4) the presence of statements strongly against penal interest."  *See Farrell*, 211 F. App'x at 773 (citations omitted).   On the other hand, factors that may demonstrate trustworthiness include the level of detail and whether the statement includes facts that would not have been known by the general public at the time.  *See Stevens*, 465 F.3d at 1241 (addressing level of detail); *Weedman v. Hartley*, 396 F. App'x 556, 563 (10th Cir. 2010) (addressing facts not known to general public).

Respondents argue several factors demonstrate the trustworthiness of Mr. Martirosyan's statement, including what Respondents describe as "extreme detail and contemporaneously verifiable assertions"; the inclusion of details Mr. Martirosyan had no motivation to invent; Mr. Martirosyan's description of Petitioner as "subdued and not explicitly admitting anything"; that Mr. Martirosyan did not appear "unstable or intimidated by the police"; that Mr. Martirosyan remained "steadfast in his account" after initially providing a different version of events during the interview at his school; that portions of the statement were unquestionably self-inculpatory; and the absence of an attempt to "curry favor" with the police.  [Doc. 24 at 36–39 (emphasis omitted)].

The Court is not persuaded that the presumption of unreliability has been rebutted.   For

one thing, some of the factors identified by Respondents, such as the presence of corroborating evidence and self-inculpatory admissions, do not demonstrate trustworthiness. *See Brown v. Uphoff*, 381 F.3d 1219, 1225 (10th Cir. 2004) ("The Supreme Court's holdings regarding the use of corroborating evidence and voluntariness are unequivocal: reliance on them is inappropriate for determining whether a statement is trustworthy."); *see also Farrell*, 211 F. App'x at 773. Mr. Martirosyan's effort to minimize his culpability is another factor that weighs against a finding of trustworthiness. *See Stevens*, 465 F.3d at 1241. In particular, despite the fact that Mr. Martinez was making threatening statements toward Zach Obert and Ed Morales after being picked up at the hospital, Mr. Martirosyan sought to minimize his own culpability by insisting that he believed the purpose of going to the South Paris Way location was merely to hide the shotguns. The fact that much of the Martirosyan statement came in response to leading questions from the detectives during the interview also weighs against a finding of trustworthiness. *See id.* at 1242. So does Mr. Martirosyan's fugitive status. Finally, there is no dispute that Mr. Martirosyan did not provide one consistent version of events, as he initially denied knowing anything about the shootings before changing his story.

Ultimately, the Court cannot conclude on de novo review that the reliability of Mr. Martirosyan's statement "is so apparent from the record that cross-examination at [Petitioner's] trial would have been only of 'marginal utility.'" *Stevens*, 465 F.3d at 1242 (citation omitted). Thus, the Court finds that admission of Mr. Martirosyan's statement violated Petitioner's Sixth Amendment right to confront the witnesses against him under *Roberts*.

## III.    Harmless Error Review

"For reasons of finality, comity, and federalism, habeas petitioners 'are not entitled to habeas relief based on trial error unless they can establish that it resulted in actual prejudice.'"

*Davis v. Ayala*, 576 U.S. 257, 267 (2015) (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993)) (internal quotations omitted).   "The *Brecht* standard reflects the view that a 'State is not to be put to th[e] arduous task [of retrying a defendant] based on mere speculation that the defendant was prejudiced by trial error; the court must find that the defendant was actually prejudiced by the error.'"   *Id.* at 268 (quoting *Calderon v. Coleman*, 525 U.S. 141, 146 (1998) (per curiam) (alterations in original)).

"Under this test, relief is proper only if the federal court has grave doubt about whether a trial error of federal law had substantial and injurious effect or influence in determining the jury's verdict."   *Id.* at 267–68 (quotation omitted).   "There must be more than a reasonable possibility that the error was harmful."   *Id.* at 268 (quotation omitted).   "Grave doubt" exists when "the matter is so evenly balanced that [the Court is] in virtual equipoise as to the harmlessness of the error."   *O'Neal v. McAninch*, 513 U.S. 432, 435 (1995).   Importantly, "[t]he inquiry cannot be merely whether there was enough to support the result, apart from the phase affected by the error. It is rather, even so, whether the error itself had substantial influence."   *Kotteakos v. United States*, 328 U.S. 750, 765 (1946); *see also Jensen v. Clements*, 800 F.3d 892, 904 (7th Cir. 2015) ("[T]he harmless error test does not focus just on the sufficiency of other evidence.   The question as we conduct the *Brecht* analysis is whether we are in grave doubt about whether a trial error of federal law had substantial and injurious *effect or influence in determining the jury's verdict*." (quotation omitted)).

In the context of a Confrontation Clause violation in particular, the prejudicial effect of the error "depends upon a host of factors" including "the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-

examination otherwise permitted, and, of course, the overall strength of the prosecution's case." *Delaware v. Van Arsdall*, 475 U.S. 673, 684 (1986); *see also Farrell*, 211 F. App'x at 776.

### A.      Evidence at Trial

The Court's harmless error determination is based upon a review of the entire state court record.  *See Herrera v. Lemaster*, 225 F.3d 1176, 1179 (10th Cir. 2000).   Therefore, the Court examines the evidence presented at Petitioner's trial via witness testimony.  *See generally* [Doc. 21].   Because the central issue at Petitioner's trial was the identity of the second shooter, the Court focuses on the evidence relevant to that issue.

### 1.      South Paris Way Location

The Court has previously discussed the salient portions of the Martirosyan interview describing his version of the events of September 7, 1998, relevant to the South Paris Way location where Zach Obert and Ed Morales were shot and killed.   At its core, Mr. Martirosyan admitted he drove the shooters to and from the South Paris Way location and he identified Petitioner as the second shooter.   *See* [Doc. 1-10 at 12–31].

Another witness at the South Paris Way location, Barbara Springston ("Ms. Springston"), saw four young men in the parking lot in front of her home around 1:00 p.m.; she watched them take objects out of the trunk of a silver Nissan Sentra; she observed two of the men run across the street and around the corner of a building with what looked like long guns; she heard two groups of shots approximately five to ten seconds after the two men disappeared from her sight; and she saw the two men return quickly and jump in the car, which sped away with all four men.   [Doc. 21, 5/26/99 Tr. at 125–28, 134–37].[6]   Ms. Springston identified Mr. Martinez as one of the men

---

[6] The Court cites trial testimony, as located in the state court record, [Doc. 21], by indicating the relevant day and using each transcript's internal page numbering.

with a gun that ran across the street.   [*Id.* at 129].   She did not identify Petitioner, although she provided a description of the other three young men.   [*Id.* at 129–34, 137–41].   Ms. Springston's description did not clearly identify or exclude Petitioner as the second shooter.   *See* [*id.* at 168].

Bernard Harris ("Mr. Harris"), who was with Ms. Springston in her home, heard gunshots and saw two men running to a silver Nissan Sentra carrying what appeared to be rifles.   [Doc. 21, 6/8/99 Tr. at 93–100].   Mr. Harris provided a description of the two individuals he saw but that description also did not clearly identify or exclude Petitioner as the second shooter.   [*Id.* at 98–99].

### 2.   East Harvard Avenue Location

Marissa Avalos, Greg Medla, and Penny Bowman-Medla were shot and killed at the East Harvard Avenue location.   The East Harvard Avenue location is near the Telegraph Hills apartment complex in which Mr. Martinez and Steve Lawson ("Mr. Lawson"), whose testimony is discussed below, lived.

Jimmy Jarman ("Mr. Jarman") was outside his house at about 2:00 p.m. when he heard voices and saw two older teenagers with shotguns walk by heading toward the house across the street.   [Doc. 21, 5/27/99 Tr. at 33–34, 39–40].   Mr. Jarman went inside and told his stepbrother, Derrick Boesel ("Mr. Boesel"), what he saw.   [*Id.* at 40–41].   Mr. Jarman heard shots and saw the two teenagers exit the house across the street, still carrying the shotguns, and run toward the Telegraph Hills apartment complex.   [*Id.* at 41–44].   Mr. Boesel heard two or three shots, called 911, and saw two teenagers running with shotguns from the house across the street toward the Telegraph Hills apartment complex.   [*Id.* at 63–64, 72].

Kayla Reichert ("Ms. Reichert") was upstairs at the East Harvard Avenue location when she heard two bangs.   [*Id.* at 204–07].   Ms. Reichert heard two or three more bangs while on the

upstairs landing and saw an individual she recognized as Mr. Martinez running upstairs from the basement with a gun.   [*Id.* at 208–11].

### 3.   Steve Lawson Testimony

In addition to Mr. Martirosyan, the prosecution identified Mr. Lawson as one of the key witnesses.   [Doc. 1-15 at 60].   Mr. Lawson lived in a second-floor apartment in the Telegraph Hills apartment complex with his mother and brother.   [Doc. 21, 6/1/99 Tr. at 33, 67].   Mr. Lawson was friends with Mr. Martinez, who lived in the same apartment complex and had gone to the same high school, and Mr. Lawson knew Petitioner.   [*Id.* at 34–35, 44].

Shortly after 2:00 p.m. on September 7, 1998, Mr. Martinez burst into Mr. Lawson's apartment carrying a shotgun and yelling that he had just "smoked Greg, Marissa," and some others.   [*Id.* at 67–69].   Mr. Martinez demanded Mr. Lawson drive him to an Outback Steakhouse, and Mr. Lawson grabbed the keys to his mother's car and left the apartment with Mr. Martinez.   [*Id.* at 71–72].   Outside, Petitioner was coming up the stairs to the apartment carrying a shotgun.   [*Id.* at 72].   All three went to the Mr. Lawson car and, as they were getting in, Mr. Martinez told Petitioner he had brains on his shirt and Mr. Lawson saw a red circle on Petitioner's shirt.   [*Id.* at 75–78].

Mr. Lawson drove Mr. Martinez and Petitioner to the Outback Steakhouse because Mr. Martinez said he wanted to kill his girlfriend and she worked at the restaurant.   [*Id.* at 87–88]. During the drive, Mr. Martinez took his shirt off and passed it to Petitioner.   [*Id.* at 79].   Mr. Martinez was still wearing a tank top.   [*Id.*].   Mr. Martinez was excited and bragging about the shootings.   [*Id.* at 87, 105–07].   At one point, Mr. Martinez said Petitioner "shot Zack [sic]," and Petitioner said nothing.   [*Id.* at 106].   Petitioner was generally quiet and reserved during the drive, but Petitioner did refer to shooting someone himself; Petitioner mentioned it was "cool"

when "Marissa's head exploded"; Petitioner said "we should slow down, we shouldn't have killed more people"; and Petitioner indicated Mr. Martinez had almost shot Petitioner because Petitioner could feel the wave of one of the shotgun blasts.   [*Id.* at 87, 109–13].

At the Outback Steakhouse, Mr. Martinez did not see his girlfriend's car, so they kept driving.   [*Id.* at 89].   Mr. Martinez said he needed to make a telephone call, so Mr. Lawson stopped at a Burger King.   [*Id.* at 90].   Police confirmed a call was made from a pay phone at the Burger King to the Pogosyan residence at 2:42 p.m.   [Doc. 21, 6/2/99 Tr. at 109–10].   When Mr. Martinez got back into Mr. Lawson's car, he said they had a ride and there was a conversation about hiding the shotguns.   [Doc. 21, 6/1/99 Tr. at 92–93].   Mr. Lawson drove to an area where the shotguns were hidden in a grove of trees and then drove Mr. Martinez and Petitioner to a Home Depot where they were going to be picked up.   [*Id.* at 93, 103].   According to the Martirosyan statement recounted above, Mr. Martirosyan and Roman Pogosyan picked Mr. Martinez and Petitioner up at a Home Depot.   *See* [Doc. 1-10 at 48–49].

After leaving Mr. Martinez and Petitioner at the Home Depot, Mr. Lawson drove to his apartment in the Telegraph Hills apartment complex and found the complex blocked off by police. [Doc. 21, 6/1/99 Tr. at 114–15].   Mr. Lawson spoke to officers but said nothing about what happened with Mr. Martinez and Petitioner.   [*Id.* at 115–18].   Mr. Lawson then went to a friend's house.   [*Id.* at 120].   A short while later, Mr. Lawson returned his mom's car to a parking lot near his apartment complex so she could drive to work that afternoon and, while there, spoke with another police officer.   [*Id.* at 117–18, 124].   Mr. Lawson denied knowing Mr. Martinez and again said nothing about what happened earlier that day with Mr. Martinez and Petitioner.   [*Id.* at 124–25].   After urging from his friends, Mr. Lawson agreed to talk to the police and gave a statement that evening at the police station.   [*Id.* at 128–30].   Mr. Lawson also rode with a

23

detective to the location where the shotguns were hidden.   [*Id.* at 131].   At that location, police discovered a body that was identified as Mr. Martinez.   [*Id.* at 133–34].   The shotguns were not recovered there or anywhere else.   [Doc. 1-16 at 151–52].

In his Reply, Petitioner argues that Mr. Lawson's testimony was "markedly different" from the Martirosyan statement because Mr. Lawson was not present during the South Paris Way or East Harvard Avenue shootings.   [Doc. 30 at 10].   Petitioner also highlights the fact that Mr. Lawson initially did not implicate Petitioner and, when he later agreed to speak to the police again and implicated Petitioner, he did so to take suspicion away from himself.   [*Id.* at 9–10].   Petitioner also points to testimony that indicates the police did not believe everything Mr. Lawson told them.   [*Id.* at 9].

### 4.   Admissions/Confessions

Jordan Jensen ("Mr. Jensen") was with Robbie Chermela ("Ms. Chermela") when they picked Mr. Martinez and Petitioner up near Petitioner's house between 6:00 and 7:00 p.m. on September 7, 1998.   [Doc. 21, 6/3/99 Tr. at 104–06].   Petitioner needed to use a telephone to page someone, so they drove to a Taco Bell.   [*Id.* at 109].   Mr. Martinez was aggressive and bragging that "he capped five people in the head."   [*Id.* at 107–08].   When Ms. Chermela told Mr. Martinez not to talk to her like that, Mr. Martinez told her that he had killed five people, and she should not make herself the sixth.   [*Id.* at 113].   Petitioner was attempting to calm Mr. Martinez down during the drive to Taco Bell and telling him to be quiet.   [*Id.* at 111].   Ms. Chermela became upset at the comments Mr. Martinez was making, so Ms. Chermela and Mr. Jensen drove off and left Mr. Martinez and Petitioner at the Taco Bell.   [*Id.* at 108–10].

Noelle Peterson ("Ms. Peterson"), a close friend of Petitioner and Roman Pogosyan, talked to Petitioner on the telephone several times on the afternoon of September 7, 1998.   [Doc. 1-15 at

88–89, 94].   At one point Petitioner was "moody" and "on the verge of tears" and told Ms. Peterson that he and Mr. Martinez had killed five people that day, he himself had killed three people, and he "was either going to kill himself or spend the rest of his life in jail."   [*Id.* at 100–01].   Petitioner also told Ms. Peterson that Ms. Chermela "was a bitch" and had "ditched him." [*Id.* at 103].   That evening Ms. Peterson told her friend, Talitha McCoy ("Ms. McCoy"), about the conversation with Petitioner and that Petitioner had said he and Mr. Martinez had shot some people and that Petitioner was scared he would go to jail.   [*Id.* at 108; Doc. 1-16 at 10].   Ms. Peterson told Ms. McCoy that she did not know if Petitioner had been joking.   [Doc. 1-16 at 13]. Ms. Peterson gave several conflicting accounts over time and Petitioner argues that Ms. Peterson changed her story to implicate Petitioner only after being threatened by law enforcement in connection with her own juvenile criminal case.   [Doc. 30 at 6–8].   Petitioner also notes that Ms. Peterson ended her initial cross-examination by agreeing with the statement that she believed Roman Pogosyan was "more likely to do something like this" than Petitioner.   [*Id.* at 8; Doc. 1-15 at 133].

Jose Soriano ("Mr. Soriano"), a friend of Petitioner and Mr. Martinez, learned from a late television news broadcast on September 7, 1998, that Mr. Martinez was a suspect in several murders.   [Doc. 21, 6/8/99 Tr. at 30, 33–35].   Mr. Soriano then spoke on the telephone with Petitioner.   [*Id.* at 35–36].   Petitioner told Mr. Soriano he had been with Mr. Martinez; he told Mr. Soriano "we shot a dude, Zach, Ed, Marissa and her mom" and "we just blasted all of them"; he told Mr. Soriano he had never seen so much blood; he told Mr. Soriano "we shot everybody" and "everybody is dead"; and he told Mr. Soriano that Mr. Martinez was dead.   [*Id.* at 36–41]. Mr. Soriano's mother testified that Mr. Soriano had a telephone conversation with Petitioner the night of September 7, 1998.   [*Id.* at 76–78].   Petitioner notes that Mr. Soriano initially denied

Petitioner was involved and argues that Mr. Soriano only changed his story to implicate Petitioner because he was on probation, and could be sent back to jail.   [Doc. 30 at 8–9].

Galen Felder ("Mr. Felder"), a fellow inmate, testified that he did not remember what he told police detectives about a jailhouse conversation with Petitioner in February 1999.   [Doc. 21, 6/3/99 Tr. at 129–30].   Mr. Felder specifically did not remember telling detectives that Petitioner said his case was one of the biggest in Colorado, that Petitioner and a friend named Mike did some killing with shotguns, and that not everybody in jail for killing was in for killing six people.   [*Id.* at 131–33].   A detective testified that Mr. Felder did make these statements in an interview.   [*Id.* at 170–77].

### B.   *Van Arsdall* Factors

There is some overlap among the relevant factors identified in *Van Arsdall*: the importance of the testimony, whether the testimony was cumulative, the presence or absence of corroborating or contradictory evidence on material points, the extent of any cross-examination, and the overall strength of the prosecution's case.   *Van Arsdall*, 475 U.S. at 684.   Nevertheless, the Court addresses each factor individually.   Additionally, while the Court does not focus solely on the sufficiency of the other evidence in assessing whether admission of the Martirosyan statement was harmless under *Brecht*, the Court's consideration of the factors the Supreme Court has identified as relevant in *Van Arsdall* necessarily requires a close examination of the other evidence.

### 1.   Importance

The first factor is the importance of Mr. Martirosyan's statement in the prosecution's case. According to Petitioner, Mr. Martirosyan's statement was the only direct evidence that Petitioner went into the home at the South Paris Way location, and Mr. Martirosyan was the only person who identified Petitioner as one of the shooters as the shooting was happening.   [Doc. 1 at 79].

Petitioner emphasizes that the other eyewitnesses did not identify Petitioner and no physical evidence linked Petitioner to the shootings. [*Id.* at 79–80]. Petitioner also contends that Mr. Martirosyan's statement was the only evidence that Petitioner committed a burglary, the predicate offense for his felony murder convictions. [*Id.* at 79]. Petitioner next points to the repeated references to the Martirosyan statement in the prosecution's opening statement and closing arguments. [*Id.* at 80–81]. Finally, Petitioner notes that the Martirosyan statement was one of the only pieces of evidence the jury requested to review during deliberations. [*Id.* at 81].

Respondents counter that the Martirosyan statement had minimal importance because the video took up only ninety minutes of a three-week trial, the jury saw the video one time and was not provided a transcript, the prosecution contended that guilt was established regardless of the Martirosyan statement, Mr. Martirosyan was not actually a "key witness," and any argument that the importance of the video is shown by the jury's request to watch the video again during deliberations is speculation. [Doc. 24 at 41–45].

The Court finds that the importance of the Martirosyan statement lies somewhere between these poles. The Court is not persuaded by Respondents' argument that the Martirosyan statement was not substantively important and merely "provided the only single, continuous narrative of the first half of the day" that "made it easier for the jury to understand how the other witnesses' testimony relating to that portion of the day fit together." [*Id.* at 43–44]. The prosecution, in its opening statement, described Mr. Martirosyan as one of the "key witnesses," [Doc. 1-15 at 60], and discussed the Martirosyan statement in detail. In its initial closing argument, the prosecution described the Martirosyan statement as some of the "most compelling" testimony and made repeated references to the statement in connection with particular elements that needed to be proven to find Petitioner guilty. [Doc. 1-17 at 55–57]. In rebuttal, the prosecution again made

multiple references to the Martirosyan statement.   Clearly, the prosecution believed the Martirosyan statement was important evidence.   *See* [*id.* at 114, 119, 124–25].

However, while the Court agrees with Petitioner that the Martirosyan statement was important at his trial, the Court respectfully concludes that Petitioner overstates its importance. First, the prosecution did in fact suggest to the jury that the Martirosyan statement was not necessary to find Petitioner guilty, *see* [*id.* at 127], and the Court agrees that a reasonable jury could have found Petitioner guilty without considering the Martirosyan statement.   Second, while Petitioner is correct that no physical evidence linked him to the shootings, it is also the case that no physical evidence identified someone else as the second shooter; moreover, Mr. Martirosyan himself did not claim to see any actual shooting.   Third, Petitioner's argument about the jury's request to review the Martirosyan video during deliberations is speculative.   The Court notes that the request was denied, and that the jury also asked to review the tape of a 911 call during deliberations, both of which undercut to some extent the significance of the request to review the video.   [*Id.* at 140–41].

Fourth, the Court is unpersuaded by Petitioner's argument that the Martirosyan statement is the only direct evidence that identifies Petitioner as the second shooter.   [Doc. 1 at 79].   The Martirosyan statement does provide an identification of Petitioner as the second shooter from a joint participant, solely with respect to the South Paris Way shooting, [Doc. 1-10 at 20–24], but the Martirosyan statement was not the only evidence that identified Petitioner as the second shooter.   Petitioner identified himself as the second shooter at both locations in his actions and statements as recounted by Mr. Lawson, Ms. Peterson, Mr. Soriano, and Mr. Felder (as recounted by the detective).   Petitioner argues that each of these witnesses had credibility issues, and that is certainly true.   Mr. Lawson admitted he lied to the police and was himself suspected of being

involved in the shootings at the South Paris Way and East Harvard Avenue locations, and the Martinez murder, as well as an uncharged prior drive-by shooting.  [Doc. 21, 6/1/99 Tr. at 119, 125, 135, 170–75, 225–26].   Ms. Peterson gave several statements denying Petitioner was involved in the shootings before changing her story after meeting with the District Attorney regarding her own juvenile case.  [Doc. 1-15 at 109–10, 116–17, 131–33].   On the other hand, Ms. Peterson contemporaneously told another friend, Ms. McCoy, about Petitioner's confessional statements.  [*Id.* at 108; Doc. 1-16 at 10].   Mr. Soriano likewise initially denied Petitioner was involved in the shootings before changing his story, and Mr. Soriano was on probation.  [Doc. 21, 6/8/99 Tr. at 42, 52, 67].   Mr. Felder was presented by the prosecution as a jailhouse snitch, although he denied it on the stand.  [Doc. 21, 6/3/99 Tr. at 129–30].   But the jury was aware of these credibility issues because the defense thoroughly cross-examined each witness about the initial denials and inconsistencies and their possible motivation to testify against Petitioner.  *See, e.g.*, [Doc 1-15 at 126–32].   Therefore, despite the credibility issues, the Court cannot discount the testimony of these witnesses in its harmless error analysis.   The number of separate confessions by Petitioner diminishes the importance of the Martirosyan statement.

Fifth, the Court finds this case distinguishable from *Jensen v. Clements*, 800 F.3d 892 (7th Cir. 2015), which Petitioner cites in support of his argument that the Martirosyan statement was uniquely important.  [Doc. 30 at 16].   In *Jensen*, a handwritten letter from a murder victim to the police was admitted in violation of the defendant's Sixth Amendment right to confrontation. *Jensen*, 800 F.3d at 894–95, 901.   In the letter, which was written two weeks before the victim's death, the victim "wrote that she would never take her life and that her husband should be the suspect if anything should happen to her."  *Id.* at 895.   The defendant in *Jensen* was the victim's husband.

The Martirosyan statement and the letter in *Jensen* are not entirely dissimilar.   In both cases, the erroneously admitted evidence was identified by the prosecution as being important and was presented as such in opening statements and closing arguments.   *See id.* at 904. Additionally, in both cases, the jury asked to see the erroneously admitted evidence during deliberations.   *See id.* at 905.   But the Court cannot conclude that, for purposes of harmless error analysis, the Martirosyan statement was as important in the case against Petitioner as the victim's letter was in *Jensen*.

In *Jensen*, the prosecution described the letter as "a make or break issue," an "essential component of the State's case," and of "extraordinary value" to "the central issue in this case." *Id.* at 894, 905–06.   Additionally, the Seventh Circuit noted the letter "was unlike anything else in evidence," "played a key role in the trial from the outset," and "was . . . the last thing the State left in the jury's mind before it deliberated."   *Id.* at 904.   Furthermore, "[t]welve witnesses testified about the letter, including five experts," and "the jury's second note in its thirty hours of deliberations requested the letter."   *Id.* at 905.   Based in part on these circumstances, the Seventh Circuit concluded the *Brecht* standard was met and affirmed the grant of the defendant's habeas petition.   *Id.* at 908.

Here, the Martirosyan statement was not critically important, like the letter in *Jensen*. Petitioner's trial included inculpatory evidence that came straight from Petitioner in the form of his actions and statements recounted by Mr. Lawson, Ms. Peterson, Mr. Soriano, and the detective who spoke with Mr. Felder.   The prosecution also did not rely on the Martirosyan statement as "a make or break issue" or an "essential component of the State's case."   Thus, the Court is respectfully unpersuaded that the Martirosyan statement played a key role throughout Petitioner's trial like the "letter from the grave" in *Jensen*.   *Id.* at 905.

### 2. Cumulativeness

Petitioner argues Mr. Martirosyan's statement was not cumulative because Mr. Martirosyan's account is the sole direct eyewitness testimony naming Petitioner as a shooter. [Doc. 1 at 81]. The Court respectfully disagrees with Petitioner's cumulativeness argument because the Martirosyan statement was not the only evidence that identified Petitioner as a shooter on September 7, 1998. Instead, as previously discussed, several witnesses testified that Petitioner confessed to the killings and made other inculpatory statements both on the day of the shootings and in the time that followed.

### 3. Corroborating or Contradicting Evidence

Petitioner argues that the Martirosyan statement is not corroborated by other eyewitness testimony or by any physical evidence. [*Id.*]. But with respect to the material portion of the Martirosyan statement—the identity of the second shooter—the statement was corroborated by the evidence from other witnesses describing Petitioner's actions and confessions on the day in question. Regarding the absence of corroborating physical evidence, the Court again notes that there also is no physical evidence that contradicts the Martirosyan statement with respect to the identity of the second shooter.

### 4. Extent of Cross-Examination

The parties do not dispute that no cross-examination of Mr. Martirosyan occurred. [Doc. 1 at 81; Doc. 24 at 52]. However, Respondents note that the detectives who conducted the interview were subject to cross-examination and Petitioner was able to attack Mr. Martirosyan's statements indirectly by eliciting testimony that the detectives believed parts of the statement "defied logic" and were "ludicrous," that Mr. Martirosyan generally sought to minimize his role, and that Mr. Martirosyan asked at one point "what could I say to get me out of this shit?" [Doc.

24 at 52–53 (alterations omitted)]. However, the Court is not persuaded that the cross-examination of the detectives who conducted the interviews is particularly significant in the context of harmless error review under *Brecht*, considering the undisputed absence of cross-examination of Mr. Martirosyan himself and the credibility concerns that led the Court to find a Confrontation Clause violation. Therefore, this factor weighs in Petitioner's favor.

### 5.    Strength of the Prosecution's Case

Petitioner contends that, without Mr. Martirosyan's statement, the prosecution's case would have been weak because the Martirosyan statement was the "most direct evidence" regarding the central issue—the identity of the second shooter. [Doc. 1 at 81]. But even if the Court agreed that the Martirosyan statement was the most direct evidence regarding the identity of the second shooter, "most direct" does not mean "only." The Court has recounted in some detail the evidence other than the Martirosyan statement that identified Petitioner as the second shooter at both locations, including multiple inculpatory statements directly from Petitioner himself. The Court concludes that the prosecution presented a strong case at trial with respect to Petitioner's participation in the events of September 7, 1998, alongside Mr. Martinez. Petitioner also contends that the length of time the jury deliberated is indicative of the relative weakness of the case against him. [Doc. 30 at 16]. But in the context of a trial that spanned three weeks, and considering the large number of charges, the Court is not persuaded that the length of the deliberations demonstrates the prosecution's case against Petitioner was weak.

### 6.    Summary of *Van Arsdall* Factors

Based on the Court's review of the entire record, the Court concludes that introduction of the Martirosyan statement constituted harmless error under *Brecht*. The evidence was important —though not critically important or decisive—and Mr. Martirosyan was not subjected to cross-

examination, two factors that weigh in Petitioner's favor.   However, as it relates to the central issue at Petitioner's trial (the identity of the second shooter), the Martirosyan statement was cumulative, corroborated by other evidence, and uncontradicted.   Furthermore, the Court's review of the record reveals that the prosecution's case against Petitioner was strong.   With or without the Martirosyan statement, the jury heard several witnesses recount Petitioner's contemporaneous confession to the killings of September 7, 1998.   Thus, the Court does not find itself in "grave doubt" about whether the introduction of the Martirosyan statement at Petitioner's trial had "substantial and injurious effect or influence in determining the jury's verdict."   *Ayala*, 576 U.S. at 268.

## CONCLUSION

For the reasons discussed in this Order, Petitioner has not demonstrated that he is entitled to habeas relief.   The Court will, however, issue a certificate of appealability because Petitioner makes a substantial showing of the denial of his Sixth Amendment right to confrontation.   *See* 28 U.S.C. § 2253(c).

For the foregoing reasons, it is **ORDERED** that:

(1)      The Application for Writ of Habeas Corpus Pursuant to 28 U.S.C. § 2254, [Doc. 1], is denied and this case is **DISMISSED WITH PREJUDICE**; and

(2)      The Court **ISSUES** a certificate of appealability on the Confrontation Clause issue pursuant to 28 U.S.C. § 2253(c).[7]

---

[7] Pursuant to Rule 11(a) of the Rules Governing Section 2254 Cases, the Court must grant or deny a certificate of appealability when it enters a final order adverse to the applicant.   *See Godinez v. Williams*, No. 21-cv-00695-RBJ, 2022 WL 1642497, at *17 (D. Colo. May 24, 2022).   A certificate of appealability may only issue when an applicant has made a substantial showing of the denial of a constitutional right, 28 U.S.C. § 2253(c)(2), i.e., when "jurists of reason could disagree with the district court's resolution of [the] constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further."   *Miller-*

DATED:   June 20, 2023               BY THE COURT:

_____
Nina Y. Wang
United States District Judge

---

*El v. Cockrell*, 537 U.S. 322, 327 (2003).   This Court finds that Petitioner has met this standard, and thus grants a certificate of appealability as to the Confrontation Clause issue.   28 U.S.C. § 2253(c)(3).